# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*ex rel.*<br><br>BRADY FOLLIARD,<br><br>      Plaintiff-Relator,<br><br>v.<br><br>CDW TECHNOLOGY SERVICES, INC., and<br>CDW GOVERNMENT, INC.,<br><br>      Defendants. | Civil Action No. 07-2009 (ESH) |

## MEMORANDUM OPINION

Plaintiff-relator Brady Folliard ("relator") brings this *qui tam* suit under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, on behalf of the United States against defendants CDW Technology Services, Inc. ("CDWTS") and CDW Government, Inc. ("CDWG") (collectively "CDW"). Before the Court is defendants' motion to dismiss the complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). For the reasons discussed herein, defendant's motion is granted in part and denied in part.

## BACKGROUND

As alleged in the amended complaint, relator has worked since January 2004 as a "strategic account executive" for Insight Public Sector ("IPS"), a Maryland-based company, selling "information technology products, services, and systems to federal agencies" in the District of Columbia, Maryland, and Virginia. (Am. Compl. ¶¶ 6, 8.) IPS is a value-added reseller ("VAR"), selling other companies' computer products in specially designed

configurations tailored to its own customers' needs. (*Id.* ¶¶ 9-10.) In essence, IPS and other VARs are "middle-men in the supply chain between the technology manufacturers and their ultimate customers." (*Id.* ¶ 11.) IPS sells products and services to the federal government pursuant to a "Solutions for Enterprise-Wide Procurement" ("SEWP") contract maintained by the National Aeronautics and Space Administration ("NASA") and a "GSA Advantage" contract with the General Services Administration ("GSA"). (*See id.* ¶¶ 14-15.) Vendors with SEWP or GSA Advantage contracts can offer and sell their products through a government website associated with each contract. (*See id.* ¶¶ 17-18.) IPS is an "authorized selling agent" of Hewlett-Packard ("HP") computer products under the SEWP contract, and relator "also sells products through the GSA Advantage [w]ebsite." (*Id.* ¶¶ 15, 18.)

Defendant CDWTS is an Illinois-based corporation that provides information technology products and services to government and non-government customers. (Am. Compl. ¶ 7.) Defendant CDWG is a wholly-owned subsidiary of CDWTS that sells to government customers on CDTWS's behalf. (*Id.*) For all times relevant to the complaint, CDWG has sold products and services to government customers pursuant to its own SEWP contract (number NNG07DA35B) and GSA Advantage contract (number GS-35F-0195J). (*Id.* ¶¶ 7, 14.) CDWG is permitted to sell and does sell HP products under both the SEWP and GSA Advantage contracts. (*Id.* ¶ 15.)

Federal agency acquisitions are subject to the requirements of the Trade Agreements Act ("TAA"), 19 U.S.C. § 2501 *et seq.*, and its related regulations, which limit the countries of origin from which federal agencies may purchase supplies. (*See also* Am. Compl. ¶ 7.) Federal Acquisition Regulation ("FAR") 52.225-5 specifies the "designated countr[ies]" whose "end products" may be purchased for public use under acquisition contracts. *See* FAR 52.225-5 ("Trade Agreements" clause). (*See also* Am. Compl. ¶ 7.) GSA does not permit products from

non-designated countries to be offered for sale on the GSA Advantage Website, and GSA procurement policies require vendors "to specifically list all products for sale and their countries of origin before the products can be approved for sale on the website." (*Id.* ¶ 22.) NASA, by contrast, permits products from non-designated countries to be listed on the SEWP website as long as vendors correctly indicate whether the product originated in a designated country, so that NASA contracting officers can determine the applicability of FAR 52.225-5, which is incorporated into the SEWP contract, on a case-by-case basis. (*Id.* ¶ 23.) By the express terms of its GSA contract and FAR 52.225-6, CDWG "certified that it would only sell end products under these contracts to the United States Government that originate in designated countries," and that it would not sell end products that originate in non-designated countries such as China, India, and Malaysia. (*Id.* ¶ 17.) *See also* FAR 52.225-6(a) (Trade Agreement Certificate requiring offeror to certify that each end product is made in U.S. or designated country). Similarly, by the express terms of its SEWP contract, CDWG "agreed to fully and truthfully identify whether each product offered for sale on the NASA SEWP website originates in a designated country as defined by the [TAA]." (Am. Compl. ¶ 17.)

To assist with TAA compliance, HP prepares and provides to its vendors, including relator and CDWG, "a product list . . . that indicates the country of origin of the HP products for sale on the GSA Advantage Website and on the SEWP contract." (Am. Compl. ¶ 18.) Relator "regularly receives and reviews" this HP product list. (*Id.*) "In the course of managing his accounts, [relator] became familiar with [the SEWP and GSA] contracts and the HP products being offered by sale by [CDWG] on the SEWP contract and on the GSA schedule, including the fact that [CDWG] sells HP products through both of these government procurement portals." (*Id.* ¶ 15.)

After reviewing the HP vendor product list in early 2007, relator determined that CDWG was offering for sale on the GSA and SEWP websites a number of HP products "that originated in China and other non-designated countries." (Am. Compl. ¶¶ 19-20.) On the SEWP website, CDWG was offering 348 end products from China. (*See id.* ¶¶ 19-21 & Ex. 1A.[1]) Of these, 140 products were falsely listed on the website as TAA-compliant, because a "Y" had been placed in "the box for TAA compliance" found on each product's information page. (*See id.* ¶¶ 21, 25 & Ex. 1B.) Contracting officers "presumably did not analyze the purchase of these products" to determine if they complied with TAA and FAR 52.225-5, because they were "relying upon the misrepresentation that the 140 products . . . were from designated countries . . . ." (*Id.* ¶ 24.) Relator also concluded that on the GSA Advantage website, CDWG was falsely listing 11 HP products as originating in the United States, when in fact they were not TAA-compliant.[2] (*See id.* ¶¶ 25-69 & Exs. 2A-12B.)

Relator originally filed this action under seal on November 6, 2007. On June 10, 2009, the United States filed a notice that it was not yet intervening, and on June 16, this Court unsealed the case. On October 13, relator amended his complaint. In Count One, citing 31 U.S.C. § 3729(a)(1) (2008), relator alleges that defendants "knowingly submitted, caused to be submitted[,] and continue to submit and to cause to be submitted false or fraudulent claims" for

---

[1] The complaint refers to this as "Exhibit 1," but a review of the exhibits and relator's opposition to the instant motion suggests that "Exhibit 1" is actually Exhibit 1A, and that the complaint's references to "Exhibit 1A" are actually references to Exhibit 1B.

[2] The complaint alleges that CDWG had listed those same 11 products on the SEWP website as *not* TAA-compliant by checking "N" in the relevant box. One of these products was, in fact, listed as TAA-compliant on the SEWP website. (*Compare* Am. Compl., ¶ 35 (alleging that SEWP listing for HP 4GB KIT PC2-5300 FBD, part number 397413-B21, had "'N' in the box indicating that the product was not TAA compliant"), *with id.*, Ex. 4B (showing same product with "Y" in TAA box).) However, the complaint elsewhere alleges that this particular product's SEWP listing was also false. (*See id.* ¶¶ 21, 24 & Ex. 1B.) Thus, this discrepancy does not undermine the allegation that all 11 products were falsely listed on the GSA website.

government payment and reimbursement "by knowingly or recklessly making false statements" about the countries of origin of those products offered for sale which "did not originate in the United States or a designated country as defined by the [TAA]" ("the presentment claim"). (Am. Compl. ¶ 73.) Count One also cites 31 U.S.C. § 3729(a)(2) (2008) and alleges that defendants "knowingly made, used or caused to be made or used, and continue to make or use or cause to be made or used[] false statements" to obtain government payment "for false or fraudulent claims" by (1) "falsely certif[ying]" that the products they sold originated in the United States or a designated country or (2) "knowingly provid[ing] false and misleading information" about those products' countries of origin despite "certifying that they truthfully and honestly provided accurate information" to the government about those countries of origin ("the false statement claim"). (*Id.* ¶ 74.) "These were material misstatements that violated the [TAA] and/or frustrated the efforts of [the government] to achieve its goals and policies under the [TAA]" (*id.*), and defendants' actions damaged the government. (*Id.* ¶ 75.) Count Two cites 31 U.S.C. § 3729(a)(3) (2008) and alleges that defendants made "false and misleading statements" and "intentionally or with gross disregard for the truth sold products to the Government that did not originate in the United States or a designated country." (*Id.* ¶¶ 78-79.) Because the government relied upon these false statements, it paid out false claims and was thereby defrauded by defendants. (*See id.* ¶¶ 79-81.)

On December 14, 2009, defendants moved to dismiss the complaint under Rules 9(b) and 12(b)(6).[3] Defendants contend that Count One's presentment claim does not adequately identify the false claims or the factual circumstances of the alleged fraud; that Count One's false statement claim fails to allege a false statement that was used to get a false claim paid and does

---

[3] Defendants also filed, and the Court granted, an unopposed motion to stay discovery pending the resolution of their motion to dismiss.

not identify a false claim paid by the government; and that Count Two fails to state the facts necessary to allege a conspiracy as required by the FCA. (Def.'s Mem. in Supp. of Mot. to Dismiss ("Def.'s Mem.") at 7, 10, 14, 17, 20.) On January 15, 2010, the United States filed a statement of interest in which it requested that if any dismissal with prejudice is entered as to relator, the complaint shall be dismissed without prejudice as to the government; addressed what it perceived as misstatements by defendants about the TAA's applicability; and argued that § 3729(a)(2) has been retroactively amended by the Fraud Enforcement and Recovery Act ("FERA"), Pub. L. 111-21, 123 Stat. 1617 (May 20, 2009). (*See* U.S. Statement of Interest ("U.S. Stmt.") at 1.)

## ANALYSIS

## I.      STANDARD OF REVIEW

### A.      Rule 12(b)(6)

"In determining whether a complaint fails to state a claim, [courts] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] . . . matters of which [courts] may take judicial notice," *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997), and documents "appended to [a motion to dismiss] and whose authenticity is not disputed" if they are "referred to in the complaint and are integral" to a relator's claim. *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) (considering content of documents on motion to dismiss where complaint relied on documents' terms and where documents were judicially noticeable); *see, e.g.*, *Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 56 n.5 (D.D.C. 2009) (considering exhibit to defendant's motion to dismiss "upon which the complaint necessarily relie[d]" and whose authenticity plaintiff did not dispute). When ruling on a motion to dismiss pursuant to Rule

12(b)(6), courts must first assume the veracity of all "well-pleaded factual allegations" contained in the complaint. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009); *see also Atherton v. Dist. of Columbia Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009). Next, courts must determine whether the allegations "plausibly give rise to an entitlement to relief" by presenting "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" in that "the court [can] draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S. Ct. at 1949-50 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### B. Rule 9(b)

Federal Rule of Civil Procedure 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To plead fraud with particularity, the party "'must state the time, place and content of the false misrepresentations, the fact misrepresented and what was [ob]tained or given up as a consequence of the fraud.'" *Kowal v. MCI Commc'ns, Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994) (quoting *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981)).

The requirements of Rule 9(b) are distinct from those of Rule 12(b)(6). *See, e.g.*, *Kowal*, 16 F.3d at 1276-79 (analyzing allegations separately under each rule); *Anderson v. USAA Cas. Ins. Co.*, 221 F.R.D. 250, 252 n.3 (D.D.C. 2004) ("[A] complaint can pass muster under the Rule 12(b)(6) threshold yet fail to comply with the strictures of Rule 9(b)."); *United States ex rel. Davis v. District of Columbia*, 591 F. Supp. 2d 30, 37-39 (D.D.C. 2008) (finding that complaint was particular under Rule 9(b) but did not state claim under Rule 12(b)(6)). The rules also serve different purposes, as "'Rule 9(b)'s requirement of particularity,'" once it is harmonized with

Rule 8's requirement of a "'short and plain statement,'" becomes "'less certain a standard for measuring the sufficiency of a complaint . . . .'" *United States ex. rel. Pogue v. Diabetes Treatment Centers of Am., Inc.* ("*Pogue II*"), 238 F. Supp. 2d 258, 267 (D.D.C. 2002) (quoting *Joseph*, 642 F.2d at 1386); *see also United States ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 116 (D.D.C. 2003) ("[T]he simplicity and flexibility contemplated by [Rule 8] must be taken into account when reviewing a complaint for 9(b) particularity."). "[T]he purpose[s] of 9(b) as read in conjunction with Rule 8" are to ensure that the complaint "is specific enough to allow [defendants] to prepare [their] defense," *Pogue II*, 238 F. Supp. 2d at 270, to prevent parties from bringing fraud claims as "a pretext for the discovery of unknown wrongs," *Kowal*, 16 F.3d at 1279 n.3 (internal quotation marks omitted), to "discourage the initiation of suits brought solely for their nuisance value, and [to] safeguard[] potential defendants from frivolous accusations of moral turpitude.'" *Joseph*, 642 F.2d at 1385 (footnote omitted).

## II.    COUNT ONE

### A.    The Presentment Claim

Relator's presentment claim is based on the pre-FERA version of 31 U.S.C. § 3729(a)(1), which establishes liability for "[a]ny person who . . . knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval . . . ." 31 U.S.C. § 3729(a)(1) (2008). The pre-FERA definition of "claim" includes "any request or demand, whether under a contract or otherwise, for money or property . . . if the United States Government provides any portion of the money or property which is requested or demanded . . . ." *Id.* § 3729(c) (2008). Although FERA amended and renumbered these provisions, the changes are not material to relator's presentment claim, *see* 31

U.S.C. §§ 3729(a)(1)(A) & (b)(2)(A) (West 2010), nor does he argue that they are. (*See generally* Pl.'s Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n") at 20-28.) Accordingly, the Court's analysis will focus on the pre-FERA text.

The elements of a presentment claim are that "(1) the defendant submitted a claim to the government, (2) the claim was false, and (3) the defendant knew the claim was false." *United States ex rel. Westrick v. Second Chance Body Armor, Inc.*, No. 04-CV-280, 2010 WL 623466, at *3 (D.D.C. Feb. 23, 2010) (internal quotation marks omitted); *see also United States v. Bouchey*, 860 F. Supp. 890, 893 (D.D.C. 1994) ("To establish either [a presentment or false statement claim], the [plaintiff] must show (1) the existence of a request for payment, and (2) that this request was fraudulent."); *accord Davis*, 591 F. Supp. 2d at 37. Defendants argue that Rule 9(b) requires relator to identify particular false claims that were submitted to the government and the factual circumstances of the alleged fraud. (Def.'s Mem. at 7, 10.) They contend that the complaint does not include the necessary level of specificity and should therefore be dismissed.[4] The Court disagrees.

---

[4] Defendants also argue that listing a product from a non-designated country on the SEWP website does not, in itself, violate the TAA, because the TAA "is only applicable to an order placed under SEWP if the *order* exceeds $194,000." (Def.'s Mem. at 8-9 (emphasis added).) They contend that because relator does not allege the value of any particular SEWP "transaction," his complaint is defective. (*Id.* at 9.) The Court rejects defendants' premise that the applicability of the TAA's country of origin restrictions is determined by reference to the value of individual transactions.

"[A] determining factor in the applicability of trade agreements" is "[t]he value of the acquisition . . . ." 48 C.F.R. § 25.402(b). The regulatory text suggests that "the value of the acquisition" refers to the overall annual value of the *contract* and not the value of each transaction under that contract. Under the applicable government procurement trade agreement, $194,000 is the "threshold" for a "[s]upply *contract*." *Id.* (emphasis added). A regulation addressing the "acquisition of supplies" also requires that FAR 52.225-5, which specifies "designated" countries, be inserted into "*contracts* valued at $194,000 or more." *Id.* § 25.1101(c)(1) (emphasis added); *see also id.* § 25.403(b)(3) (determining TAA's applicability by reference to "total estimated value" of "recurring or multiple awards for the same type of product or products" that are anticipated "in any 12-month period"). (*See also* U.S. Resp. to Defs.' Resp.

Contrary to defendants' argument, "a plaintiff need not allege the *existence* of a request for payment with particularity . . . ." *Davis*, 591 F. Supp. 2d at 37 (emphasis added); *accord Bouchey*, 860 F. Supp. at 893. Rule 9(b) requires particularity only with respect to "the circumstances *constituting fraud* . . . ." Fed. R. Civ. P. 9(b) (emphasis added). Thus, only Rule 12(b)(6)'s general standards apply to the allegation regarding the existence of a request for payment, while Rule 9(b)'s particularity requirement "applies to the [contention] that the request was *fraudulent*." *Davis*, 591 F. Supp. 2d at 37 (emphasis added); *Bouchey*, 860 F. Supp. at 893 (explaining that complaint must only allege "supporting facts with a higher degree of particularity" with respect to "the second criterion," *i.e.*, that the request was fraudulent); *see also United States ex. rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009) ("Stating 'with particularity the circumstances constituting fraud' does not necessarily and always mean stating the contents of the [claim]. . . . It is the scheme in which particular circumstances may be found that make it highly likely the fraud was consummated through the presentment of false [claims].").[5] As the D.C. Circuit has explained, "[r]eading [Rules 8 and 9(b)] in conjunction 'normally . . . means that the pleader must state the time, place and content of the false

---

to U.S. Stmt. at 1-2.)

Defendants also argue that they relied upon the SEWP website's previous suggestions that the TAA applies only to *orders* over a certain dollar threshold. (Defs.' Resp. to U.S. Stmt. at 8; *see id.* at Ex. 2 at 8.) The government correctly observes that while reliance on those suggestions might affect defendants' *scienter*, informal guidance documents such as the website cannot "change the plain language of the FAR" or "alter the applicability of the TAA." (U.S. Resp. to Defs.' Resp. to U.S. Stmt. at 2.) In addition, the complaint suggests that defendants did not, in fact, always view TAA compliance to be dependent upon the value of an order, because they allegedly listed ten products on the SEWP website as *not* TAA-compliant, even though none of these products individually cost anywhere near $194,000. (*See* Am. Compl. ¶¶ 26-33, 38-69 & Exs. 2A-3B, 5A-12B.) *See also* supra note 2.

[5] In other words, "[a] hand in the cookie jar does not itself amount to fraud separate from the fib that the treat has been earned when in fact the chores remain undone." *Grubbs*, 566 F.3d at 190.

misrepresentations, the fact misrepresented and what was [ob]tained or given up as a consequence of the fraud,'" *Kowal*, 16 F.3d at 1278 (quoting *Joseph*, 642 F.2d at 1385)), because "such misrepresentations [are] the *element* of fraud about which the rule is chiefly concerned." *United States ex rel. Totten v. Bombardier Corp.* ("*Totten I*"), 286 F.3d 542, 552 (D.C. Cir. 2002) (emphasis in original).

In *Pogue*, this Court touched on the distinction between pleading the *existence* of a claim and pleading the *circumstances* of fraud with particularity. *Pogue* involved multidistrict FCA litigation that had been transferred from the U.S. District Court for the Middle District of Tennessee. *See Pogue II*, 238 F. Supp. 2d at 261; *see also United States ex rel. Pogue v. Am. Healthcorp, Inc.* ("*Pogue I*"), 977 F. Supp. 1329 (M.D. Tenn. 1997). The gravamen of the *Pogue* complaint[6] was that the defendants – a national diabetes treatment center, various hospitals, and various physicians – "participated in a scheme to defraud the United States by filing claims for Medicare and Medicaid reimbursement for services provided to diabetes patients who were illegally referred to various treatment centers established by [the national treatment center] in the . . . hospitals." *Pogue I*, 977 F. Supp. at 1334. (*See* Defs.' Reply in Supp. of Mot. to Dismiss ("Defs.' Reply"), Ex. 1 ("*Pogue* Compl.") ¶¶ 16-32.) The *Pogue* relator was a former employee of the diabetes treatment center that allegedly contracted to receive kickbacks from the hospitals for patient referrals. (*See Pogue* Compl. ¶ 6.) However, he did not allege that he had ever worked for the hospital defendants, which were the only entities that allegedly submitted any false claims to the government. (*See id.* ¶¶ 16, 29-30, 33-34, 39-40, 45-46.) Nor did he provide any "specific information regarding the fraudulent transactions to

---

[6] Both *Pogue I* and *Pogue II* considered the fourth amended complaint on motions to dismiss that raised the same issues under Rule 9(b). *Pogue II*, 238 F. Supp. 2d at 267 nn.3-4. *Pogue II* concluded that "[n]ot only are [*Pogue I*'s] decisions the law of the case, they are also correct." *Id.* at 270.

which [the hospital] [was] alleged to have been a party," such as "the specific instances underlying each Medicare and Medicaid claim submission . . . ." *Pogue I*, 977 F. Supp. at 1332-33 (internal quotation marks omitted). Nonetheless, the complaint both "adequately alleged that false claims were submitted," *Pogue II*, 238 F. Supp. 2d at 268, and "adequately describe[d] [d]efendants' allegedly fraudulent scheme to defraud the United States of Medicare and Medicaid monies." *Pogue I*, 977 F. Supp. at 1333.

### 1. Existence of a false claim

Defendants move to dismiss Count One pursuant to Rule 12(b)(6) "for failure to plead fraud with particularity as required under" Rule 9(b). (Def.'s Mot. to Dismiss at 1.) Although they "simply refer[] to [Rule 12(b)(6)] in passing while pinning the crux of [their] challenge on Rule 9(b)'s heightened-pleading standard," *Anderson*, 221 F.R.D. at 252, the Court must first consider whether relator has pled the existence of a false claim as required by Rule 12(b)(6) before turning to defendants' argument that relator has failed to plead the circumstances of the fraud with particularity.

The complaint alleges that defendants "are *selling products* to the United States Government that did not originate in designated countries under the Trade Agreements Act" (Am. Compl. ¶ 5 (emphasis added)), and that they "*knowingly submitted*, caused to be submitted[,] and continue to submit or cause to be submitted *false or fraudulent claims* for payment and reimbursement by the United States Government" by falsely representing that the products offered for sale originated in the United States or designated countries as defined by the TAA. (*Id.* ¶ 73 (emphases added); *see also id.* ¶ 4 (alleging "presentation of false claims . . . in connection with the selling of non-compliant products").)[7] Relator offers "further factual

---

[7] Relator's false statement claim similarly alleges that defendants sold falsely listed products to the government. (*See* Am. Compl. ¶ 74 ("Defendants falsely certified that *all*

enhancement," *Iqbal*, 129 S. Ct. at 1949 (internal quotation marks omitted), by alleging that the

SEWP contract required defendants to accurately identify whether each product offered for sale

on the SEWP wesbsite was TAA-compliant (s*ee* Am. Compl. ¶ 17), that defendants falsely listed

the 140 HP products in Exhibit 1B as TAA-compliant on the SEWP website (*see id.* ¶¶ 21, 25),

and that government contracting officers purchased those products in reliance upon these false

listings.  (*See id.* ¶ 24 (alleging that officers "presumably did not analyze the purchase of these

products" for TAA compliance).)  The allegation that the government purchased the products

listed in Exhibit 1B permits "the inferential leap that claims were actually submitted for the

[items purchased]."  *Pogue II*, 238 F. Supp. 2d at 268; *see, e.g.*, *United States ex. rel. Lusby v.

Rolls-Royce Corp.*, 570 F.3d 849, 854-55 (7th Cir. 2009) (concluding that allegations that the

government paid defendants for goods permitted the inference that defendant submitted at least

one false certification under FAR 246-15, as required by its procurement contract, regarding the

goods' compliance with certain specifications).

Defendants take issue with relator's allegation that the government's reliance upon

defendants' false SEWP listings "probably led" to the procurement of the products in Exhibit 1B.

(Am. Compl. ¶ 24; *see also id.* ¶ 70.)  They argue that "relator provides no basis for his

conjecture."  (Def.'s Mem. at 8.)  Although they contend that this is a defect under Rule 9(b)

(Defs.' Reply at 10 n.9), the Court has already concluded that allegations about the existence of a

claim are not subject to the particularity requirement.  Instead, their criticism is properly

understood as an argument that relator has not complied with Rule 11.

In relevant part, Rule 11 provides that the filing of a complaint by relator or his counsel

constitutes a certification that to the best of that person's "knowledge, information, and belief,

---

*products they sold* and offered for sale to the United States originated in the United States or
designated countries as defined by the [TAA]." (emphasis added)).)

formed after an inquiry reasonable under the circumstances," "the factual contentions . . . will likely have evidentiary support after a reasonable opportunity for further investigation or discovery . . . ." Fed. R. Civ. P. 11(b)(3). The Supreme Court has explained that the "flexibility provided by Rule 11(b)(3)[] allow[s] pleadings based on evidence reasonably anticipated after further investigation or discovery." *Rotella v. Wood*, 528 U.S. 549, 560 (2000). In light of these principles, the Court reads relator's use of the phrase "probably" to mean that his factual contention regarding "the purchase of these products" (Am. Compl. ¶ 24) is based on information and belief and will "likely" be supported by the evidence, as required by Rule 11(b)(3). Indeed, relator represents that "defendants' actual requests for payment from the government and the corresponding payment stubs" are "'reasonably anticipated to be uncovered after further investigation or discovery' . . . ." (Pl.'s Opp'n at 22 (quoting *Rotella*).)

The Court concludes that relator's existing allegations provide a sufficient basis for his claim regarding defendants' sale of specific HP products. Relator alleges that for six years, he worked for a competitor of CDWG that sells the same manufacturer's products through the same procurement portals (*i.e.*, the GSA Advantage and SEWP websites) and uses the same documentary information (*i.e.*, HP's vendor product list). He has also identified 140 HP products that the government allegedly purchased from defendants in reliance on those products' false listings on the SEWP website. He further represents that these are "high volume," non-specialty computer hardware products such as "printers, scanners, disc drives, and replacement parts for products that would be necessary to the smooth operation of any office in which computers are used," such that the sheer number of false listings on Exhibit 1B "illustrates the high probability that receipts resulting from the procurement of one of these 140 items will be uncovered." (Pl.'s Opp'n at 22-23.) Moreover, he declares under penalty of perjury that "to the

best of [his] knowledge" – having gained "familiarity" with the products HP offers for sale to government customers by "regularly sell[ing] [HP] products and services" to them – it is "true and correct" that part numbers ending in "B-21" and "001" signify HP's "most frequently purchased products[] that are used [in] multiple information technology configurations sold to the Government . . . ." (*Id.*, Ex. 7 (Decl. of Brady Folliard) ¶¶ 1-3.)[8]

"[M]uch knowledge is inferential . . . and the inference that [relator] proposes is a plausible one." *Lusby*, 570 F.3d at 854. Relator's allegations provide reliable indicia from which it may be inferred that the allegedly falsely listed products were purchased and thus were tied to false claims for payment.[9] *Cf. Grubbs*, 565 F.3d at 190 ("We hold that to plead with particularity the circumstances constituting fraud for a False Claims Act § 3729(a)(1) claim, a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."). The Court is also reassured by the fact that relator's arguments regarding Rule 11(b)(3) (*see* Pl.'s Opp'n at

---

[8] The complaint alleges that defendants mislisted nine such products on the SEWP website. (*See* Am. Compl. ¶ 21 & Ex. 1B at 1 (items 405095-B21, 435565-B21, 397411B21, 397413-B21, 399546-B21, 404122-B21, 407435-B21, 408853-B21, and 433634B21).)

[9] For this reason, the Court rejects defendants' argument that because relator works for a "direct competitor" of CDWG, he cannot be absolutely certain that a false claim was submitted. (Defs.' Mem. at 2, 9-10; *see also* Defs.' Reply at 9-12.) *See also McCready*, 251 F. Supp. 2d at 119 ("[The defendant] asserts that Congress created a policy in the FCA that relators *must* be insiders. This is not the case. . . . [T]he statute contains no such requirement. Any person who can muster sufficient evidence of fraud, that is not publicly disclosed, and be the first to file a complaint alleging that fraud, may maintain a *qui tam* suit. In fact, the statute contemplates that a competitor – manifestly not an insider – may file suit." (emphasis in original; citations omitted)). Moreover, defendants' argument relies upon the Eleventh Circuit's decision in *United States ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301 (11th Cir. 2002), which incorrectly required a relator to plead the *existence* of a false claim with the same particularity required to plead the circumstances of the fraud. *See id.* at 1313-14. This Court has also already rejected the Eleventh Circuit's reasoning because it improperly sought "not particularity but proof." *Pogue II*, 238 F. Supp. 2d at 269 (embracing *Clausen* dissent); *accord Grubbs*, 565 F.3d at 190 & n.32.

12, 21-23) demonstrate that his counsel is well aware of the need to accurately represent the likelihood of a factual contention's evidentiary basis. Accordingly, the Court rejects defendants' assertion that relator's allegations regarding the existence of a claim related to the SEWP website listings are based on nothing more than "speculation and innuendo." (Defs.' Reply at 12.)

By contrast, as defendants argue, nowhere does relator specifically allege that the 11 products mislisted on the GSA website were actually bought by the government through that procurement portal. (*See* Defs.' Mem. at 12.) Rather, he alleges only that they were incorrectly listed on GSA Advantage as originating in the United States. (*See* Am. Compl. ¶¶ 25-69.) Absent an allegation that these listings were related to purchases, no inference can be drawn that false claims for payment were submitted. Because the FCA "attaches liability, not to underlying fraudulent activity, but to the claim for payment," *Totten I*, 286 F.3d at 551 (internal quotation marks omitted), the allegations regarding the GSA listings fail to state a claim under Rule 12(b)(6) with respect to a presentment theory.

### 2. Particularity of the circumstances constituting fraud

"Relator has set out a sufficiently 'detailed description' of the specific scheme and its 'falsehoods.'" *Pogue II*, 238 F. Supp. 2d at 268 (quoting *Totten I*, 286 F.2d at 552). He has informed defendants of the "content of the false misrepresentations" and "the fact misrepresented," *Kowal*, 16 F.3d at 1278 (internal quotation marks omitted), by alleging that pursuant to SEWP contract number NNG07DA35B, defendants falsely certified and listed 140 specific HP products as TAA-compliant on the SEWP website, when in fact they all originated in China, a non-designated country. (Am. Compl. ¶¶ 17, 21, 24-25 & Exs. 1A-1B; *see also* Pl.'s Opp'n at 7, 22 n.13.) The complaint also clarifies that the "place . . . of the false misrepresentations," *Kowal*, 16 F.3d at 1278 (internal quotation marks omitted), includes a point

in cyberspace, the SEWP website. (Am. Compl. ¶ 25 (CDWG "knowingly made false statements" to the government by failing "to correctly indicate" the countries of origin of the products in Exhibit 1B that were "listed for sale on the SEWP procurement portal").) *See Benz v. Washington Newspaper Publ'g Co., LLC*, No. 05-CV-1760, 2007 WL 1794104, at *3 (D.D.C. June 19, 2007) (denying motion to dismiss fraud claim where complaint "adequately state[d] the . . . place . . . of the false misrepresentations" by pleading that they were made via e-mail).[10] Relator also alleges that as a result of the alleged fraud, the government purchased products that were not TAA-compliant, in violation of the SEWP contract and acquisition regulations and in frustration of the government's TAA policies, thus making clear that the government's payments were "given up as a consequence of the fraud." *Kowal*, 16 F.3d at 1278 (internal quotation marks omitted); *see, e.g.*, *Westrick*, 2010 WL 623466, at *7 (complaint adequately alleged that "monies paid by the government . . . for falsely-warranted [products] were given up a consequence of the fraud" (internal quotation marks omitted)); *McCready*, 251 F. Supp. 2d at 119 (complaint adequately alleged "something was 'given up' as a consequence of the fraud" where "the government allegedly paid more Medicare reimbursement than was necessary to treat the patient").

The pleadings are also particular with respect to the "time . . . of the false misrepresentations . . . ." *Kowal*, 16 F.3d at 1278 (internal quotation marks omitted). Although defendants argue that relator must provide "transaction dates" on which individual claims were submitted (Defs.' Mem. at 4; *see also id.* at 11), this is incorrect. As discussed, the existence of a false claim need not be pled with particularity. *See supra* Section II.A.1. Moreover, given the

_____

[10] Defendants appear to concede that the question of "where" the misrepresentations occurred can be answered by reference to the *means* of the misrepresentation. (*See* Defs.' Reply at 7 n.7 (approving of how relator in another case identified "financial statements" as "where" misrepresentations were made).)

"multi-year period" covered by the complaint, Rule 9(b) does not require "a detailed allegation of all facts supporting each and every instance of submission of a false claim." *Pogue II*, 238 F. Supp. 2d at 268. It is enough to give defendants "notice of the charges against them" by alleging a "time frame" for the scheme rather than "specific dates" for the submission of each false claim. *Pogue I*, 977 F. Supp. at 1333 (complaint's reference to 12-year period for hospital's "participat[ion] in a systematic, fraudulent scheme" was adequate despite absence of specific dates for hospital's submission of false claims); *see also McCready*, 251 F. Supp. 2d at 117 (complaint adequately "describe[d] the time period during which the alleged fraudulent acts were perpetrated").[11] Here, relator alleges that in "early 2007," he investigated defendants' listings on the SEWP website and then determined that the 140 items in Exhibit 1B were being falsely listed as TAA-compliant. (Am. Compl. ¶¶ 19-21.) And because the amended complaint alleges that defendants "continue to submit" false claims (*id.* ¶ 73), that pleading's filing date of October 13, 2009, necessarily marks the end date for the alleged misrepresentations. This alleged "time span" of the scheme is not "open-ended," and it "give[s] the two companies 'sufficient information to allow for preparation of a response.'"[12] *United States ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251, 1257 (D.C. Cir. 2004) (finding no particularity as to time of misrepresentations where complaint did not allege "start date") (quoting *Joseph*, 642 F.3d at 1385).

---

[11] However, even if the complaint were deficient because it lacks specific transaction dates for each claim (which it is not), relator could rely on an "allege[d] lack of access" to that information "because defendants control the relevant documents . . . ." *Williams*, 389 F.3d at 1258; *see also Kowal*, 16 F.3d at 1279 n.3 ("pleadings on information and belief" are permitted but "require an allegation that the necessary information lies within the defendant's control" and "must also be accompanied by a statement of the facts upon which the allegations are based").

[12] There is therefore no merit to defendants' additional argument that the complaint "provides neither a beginning nor [an] end to CDW's purported fraud on the government . . . ." (Defs.' Mem. at 11.)

Defendants further argue that relator must name individual participants in the alleged fraud, such as "who at CDW submitted false claims to the government . . . ." (Defs.' Mem. at 12.)  This argument conflates the FCA's requirement that a false claim exist with Rule 9(b)'s requirement that the *misrepresentations* underlying the false claim be pled with particularity.  A defendant can make a misrepresentation to the government separately from a claim for payment, even though the misrepresentation relates to the claim.  *Cf. Grubbs*, 565 F.3d at 190 (observing that stating the circumstances of fraud "does not necessarily and always mean stating the contents of the [claim]").  And, of course, corporations can speak misrepresentations in their corporate capacity.  *See, e.g.*, *Sununu v. Philippine Airlines, Inc.*, 638 F. Supp. 2d 35, 42 (D.D.C. 2009) (corporation in non-FCA case allegedly misrepresented termination date of lease in agreement that it sent to plaintiffs for their signature).[13]  Here, relator contends that defendants made two misrepresentations to the government that were separate from but material to the actual claims for payment: (1) CDWG's agreement in the SEWP contract to "fully and truthfully identify whether each product offered for sale on the NASA SEWP website originates in a designated country as defined by the [TAA]" (Am. Compl. ¶ 17), and (2) the false listings on the SEWP website that the Exhibit 1B products were TAA-compliant.  Because defendants are hardly disadvantaged by relator's failure to identify which of their *own* employees were responsible for country of origin labels on the SEWP website, the allegations about the SEWP listings "give[] defendants sufficient information to allow for preparation of a response."

---

[13] Corporations have been "person[s]" subject to liability under the FCA ever since it was first enacted in 1863.  *See Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 125 (2003).  Relying on *Cook County*, one circuit court has held that "where the corporation is the defendant in a FCA action, . . . a relator need not always allege the specific identity of the natural persons within the defendant corporation that submitted the false claims," because "such information is merely relevant to the inquiry of whether a relator has pled the circumstances constituting fraud with particularity."  *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 509 (6th Cir. 2007).

*Sununu*, 638 F. Supp. 2d at 42 (denying motion to dismiss in which corporation argued that complaint failed to identify individuals involved in alleged fraud); *see, e.g.*, *Pogue I*, 977 F. Supp. at 1333 (complaint adequately pled defendant hospital's participation in "systematic, fraudulent scheme" despite not identifying individual hospital employees); *Westrick*, 2010 WL 623466, at *6 (concluding, where relator never worked for one of the defendants, that "the absence of [that defendant's] named . . . employees should not render the otherwise detailed complaint deficient under Rule 9(b)").[14]

"[T]he Court acknowledges that some cases have required greater specificity in allegations of fraud tha[n] [r]elator's complaint provides," but "Rule 9(b) is analyzed case by case." *Pogue II*, 238 F. Supp. 2d at 269-70; *see also In re Orion Sec. Litig.*, No. 08-CV-1328, 2009 WL 2601952, at *1 (S.D.N.Y. Aug. 20, 2009) ("in order to determine whether the particularity requirements of Rule 9(b) apply in a given case, courts must undertake a case-by-case analysis of particular pleadings" (internal quotation marks omitted)). "[Relator]'s accusations are not vague," and defendants "ha[ve] been told exactly what the fraud entails." *Lusby*, 570 F.3d at 855. "Discovery can be pointed and efficient, with a summary judgment following on the heels of the complaint if [sales] records discredit the complaint's particularized

---

[14] Defendants rely upon the D.C. Circuit's statement in *Williams*, citing *Joseph*, that "[w]e also require pleaders to identify individuals allegedly involved in the fraud." 389 F.3d at 1256. However, *Joseph* did not specifically require that individuals be identified, and both *Joseph* and *Williams* are distinguishable because the complaints in those cases had many shortcomings under Rule 9(b). *See Joseph* 642 F.2d at 1385-86 (finding that relator's allegations that senator used public funds to pay staffers for performing personal services "could hardly have been more generalized and vague," because relator "did not specify which members of the Senator's staff were involved," "he left unstated just what personal services they performed and precisely when those activities occurred," and "[h]e even failed to allege any neglect of official duties"); *Williams*, 389 F.3d at 1257-58 (finding that complaint did not "set[] forth [any] facts that exemplif[ied] the purportedly fraudulent scheme," did not allege "start date" for misrepresentations, and "name[d] a laundry list of individuals without specifying their relation to the fraudulent scheme").

allegations." *Grubbs*, 565 F.3d at 191. "To say that fraud has been *pleaded* with particularity is not to say that it has been *proved* (nor is proof part of the pleading requirement). [Relator's] complaint may be wrong," *Lusby*, 570 F.3d at 855, but defendants have been given enough information "to defend against the charge and not just deny that they have done anything wrong." *Williams*, 389 F.3d at 1259 (internal quotation marks omitted).

### 3.    Defendants' knowledge

The remaining element of a presentment claim is that the defendant knew the claim was false. Under the FCA, "[a] person acts knowingly if he acts with 'actual knowledge, deliberate ignorance or reckless disregard of the truth or falsity of information.' Because Rule 9(b) permits knowledge to be pled generally, there is no basis for dismissal for failure to plead knowledge with particularity." *Westrick*, 2010 WL 623466, at *7 (quoting 31 U.S.C. § 3729(b)). Relator avers that defendants "knowingly" submitted false claims premised upon misrepresentations about HP products' countries of origin. (Am Compl. ¶ 73.) He also alleges that although defendants were required by their contracts and relevant regulations to comply with the TAA, and although they received HP's vendor product list which stated the country of origin for each product, they nonetheless falsely listed 140 products on the SEWP website as TAA-compliant. If proven, these allegations would constitute circumstantial evidence of their "actual knowledge, deliberative ignorance or reckless disregard of the truth or falsity of [those products' country of origin] information." 31 U.S.C. § 3729(b); *see, e.g.*, *Westrick*, 2010 WL 623466, at *7 (complaint adequately alleged knowledge where it alleged that defendant "knew of and participated in making [a false] warranty to the government").

## B.    The False Statement Claim

### 1.    Applicability of FERA's amendments

Relator's false statement claim cites the pre-FERA version of § 3729(a)(2), which imposes civil liability upon "[a]ny person who . . . knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government . . . ." 31 U.S.C. § 3729(a)(2) (2008). "Section 3729(a)(2) attaches FCA liability to a defendant who prepares[,] in support of a claim[,] a statement that it knows to be a misrepresentation . . . ." *Westrick*, 2010 WL 623466, at *7. Relator's false statement claim is "complementary" to his presentment claim, because the FCA's false statement provision "prevent[s] those who make false records or statements" that are material to a claim "from escaping liability solely on the ground that they did not *themselves* present a claim for payment or approval." *United States ex rel. Totten v. Bombardier Corp.* ("*Totten II*"), 380 F.3d 488, 501 (D.C. Cir. 2004) (emphasis in original); *United States ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 6 (D.D.C. 2003) ("[T]he main purpose of section 3729(a)(2) is to remove any defense that the defendants themselves did not submit false claims to the government." (citing J. Boese, Civil False Claims and Qui Tam Actions 2d § 2.01[B])).

In *Allison Engine Co., Inc. v. United States ex rel. Sanders*, 128 S. Ct. 2123 (2008), the Supreme Court considered § 3729(a)(2) in the context of a defendant subcontractor's submission of false claims to a general contractor, where the general contractor paid the subcontractor with government funds, but where there was no evidence that false claims were ever submitted to the government itself. The Court held that the subcontractor could not be found liable under the FCA, because the meaning of subsection (a)(2)'s phrase "to get" required proof "that the defendant intended that the false record or statement be material to the Government's decision to

pay or approve the false claim," and not just that the general contractor used government funds to pay the claim or that the false statement resulted in the claim's payment or approval. *Id.* at 2126. In other words, "a defendant must intend that the Government *itself* pay the claim." *Id.* at 2128 (emphasis added).

FERA subsequently "legislatively overruled" *Allison Engine* by amending and recodifying subsection (a)(2) as (a)(1)(B), which now imposes liability on "any person" who "knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . ." *See* 31 U.S.C. § 3729(a)(1)(B) (West 2010). "Congress intended for the amended provision to eliminate any intent requirement and instead for liability to attach when a record or statement has 'a natural tendency to influence' or 'is capable of influencing[] the payment or receipt of money or property.'" *Westrick*, 2010 WL 623466, at *7 (quoting 31 U.S.C. § 3729(b)(4) (West 2010)) (citation omitted); *see* S. Rep. No. 111-10 (Mar. 23, 2009).

The amended provision was given retroactive effect "as if enacted on June 7, 2008" and "appl[ies] to *all claims under the False Claims Act* that are pending on or after that date . . . ." 123 Stat. at 1625 (codified as Note accompanying § 3729) (emphasis added, citation omitted). The parties and the United States have extensively debated the question of whether the retroactivity provision's use of the word "claims" refers to legal claims filed by a relator (*i.e.*, a synonym for "cases") or to claims for payment submitted by a defendant to the government, as defined under the FCA. Courts have not reached a consensus on which interpretation is correct. *Compare, e.g.*, *Westrick*, 2010 WL 623466, at *7 (reading "claims" as legal claims and retroactively applying new § 3729(a)(1)(B) because "this suit was pending on June 7, 2008"), *and United States ex rel. Kirk v. Schindler Elevator Corp.*, No. 09-CV-1678, 2010 WL 1292143, at *14 (2d Cir. Apr. 6, 2010) (same), *with United States v. Sci. Applications Int'l Corp.*, 653 F.

Supp. 2d 87, 106-07 (D.D.C. 2009) (concluding that legislative history suggests "claims" refers to claims for payment as defined by § 3729), *and United States ex rel. Sanders v. Allison Engine Co.*, 667 F. Supp. 2d 747, 752 (S.D. Ohio 2009) (same).[15]

The Court nevertheless concludes that it need not decide the question of retroactivity at this time. Relator argues that the result of FERA's amendments to the false statement provision is (1) that "intent [is] no longer necessary, so long as the false statements themselves are 'material' to the fraudulent claims," and (2) that "payment is no longer a necessary element . . . ." (Pl.'s Opp'n at 13-14.) Relator's first contention is beside the point because, as defendants correctly observe, Congress's concerns about intent are not relevant to this case. (*See* Defs.' Reply at 15-16.) Relator's second contention is incorrect: both the statutory text and legislative history confirm that the existence of a false claim remains an underlying premise of post-FERA false statement liability.

With respect to intent, FERA's legislative history clarifies that Congress contemplated that a party making false claims would intend for *someone* to pay its false claims; the criticism of *Allison Engine* was simply that it held that "there can be no liability unless the subcontractor intended to defraud the Federal Government, *not just [its] general contractor.*" S. Rep. 111-10 at 10 (emphasis added). Here, the concerns motivating FERA's amendments are not implicated. Relator alleges that defendants contracted *with the government*, and that defendants made false statements (*i.e.*, the certifications and listings regarding TAA compliance) and submitted claims for payment *to the government.* The Court can think of few situations where a party would

---

[15] The United States notes that in *Sanders v. Allison Engine*, "the very case giving rise to the questions at issue," the Ohio district court recently permitted the government to intervene for purposes of interlocutory appeal and certified an appeal of that court's ruling on the retroactivity question, holding that there was a substantial ground for difference of opinion on the correctness of its decision. (U.S. Notice of Supplemental Auth. at 2 n.2.)

submit a claim for payment directly to the government without intending that the government pay it. Thus, on the facts alleged, any change to the FCA's intent requirement is not material.

Relator is also mistaken that FERA eliminated the need to allege and prove the existence of a false claim. First, this argument ignores the titular premise of the False *Claims* Act. Second, the statutory text plainly prohibits the use of a false statement "material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B) (West 2010), which presupposes the existence of a claim. Third, even if the statute were unclear, the legislative history clarifies that Congress also presupposed the existence of a claim: "liability under [the revised] section 3729(a) attaches *whenever a person knowingly makes a false claim* to obtain money or property, any part of which is provided by the Government without regard to whether the wrongdoer deals directly with the Federal Government; with an agent acting on the Government's behalf; or with a third party contractor, grantee, or other recipient of such money or property." S. Rep. 110-10 at 11 (emphasis added); *see also id.* at 10-11 (seeking to eliminate the "exempti[on] [for] subcontractors who knowingly *submit false claims* to general contractors and are paid with Government funds" (emphasis added)).[16]

On the facts alleged, any distinction between the pre- and post-FERA false statement provision is not relevant. Accordingly, the Court's analysis will treat those provisions as materially identical for purposes of the instant motion.

---

[16] Relator's argument would also seem to render subsection (a)(1)(A) superfluous. The presentment provision still requires the submission of "a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(A) (West 2010), and inevitably, a "false claim" would require the use of some "false record or false statement." *Id.* § 3729(a)(1)(B). If a defendant could be found liable for false statements under (a)(1)(B) without the need to prove that *anyone* ever made a claim for payment, then (a)(1)(A) "would only trip up those foolish enough to rely on [that provision] rather than" (a)(1)(B). *Totten II*, 380 F.3d at 501 (discussing pre-FERA provisions).

### 2.     Sufficiency of the allegations

Relator alleges that defendants made false statements related to each government procurement contract.  As already discussed, he contends that defendants falsely listed 140 HP products on the SEWP website as TAA-compliant (*see also* Am. Compl. ¶ 70), and that they falsely listed 11 products on the GSA Advantage websites as originating in the United States. (*See id.* ¶¶ 26-69; *see also* Pl.'s Opp'n at 22.)  He also puts forth two alternate theories of defendants' liability for these alleged mislistings: (1) they "falsely certified that all the products that they sold and offered for sale to the United States Government" originated domestically or in a designated country, or (2) the acts of providing false country of origin information about their products for sale rendered false their agreement to provide accurate information.  (Am. Compl. ¶ 74.)  These misstatements are alleged to be material because they violated the TAA or frustrated the government's achievement of its TAA-related policies.  (*Id.*)

Given the common elements of the presentment and false statement provisions, *see Bouchey*, 860 F. Supp. at 893; *accord Davis*, 591 F. Supp. 2d at 37, the Court's analysis of the sufficiency of relator's presentment claim as to the products in Exhibit 1B applies with equal force to his false statement claim.  He has alleged that those products were purchased by the government in reliance upon their SEWP website listings, which permits the inference that claims were submitted; he has alleged all of the circumstances of the fraud with particularity; and he has alleged that defendants knew or should have known that the listings of TAA compliance were false in light of the HP vendor product list.

However, as discussed, the complaint fails to specifically allege that the government purchased the 11 products mislisted on the GSA website.  *See supra* Section II.A.1.  Because relator has not alleged that these particular mislistings were material to a government purchase

(*compare id.* ¶ 70 (alleging that false statements were made under SEWP and likely led to purchases of products from non-designated countries)), the Court cannot "make the inferential leap that claims were actually submitted" for these items, *Pogue II*, 238 F. Supp. 2d at 268, and therefore cannot "draw [a] reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S. Ct. at 1949. Thus, relator's allegations regarding the GSA mislistings fail to state a claim under Rule 12(b)(6) with respect to a false statement theory.

## III.    COUNT TWO

Count Two fails to state a claim, regardless of whether it is construed as based upon the pre- or post-FERA version of the FCA. To allege a claim under either version of the relevant provision, relator must allege, *inter alia*, that defendant *conspired* to defraud the government or otherwise violate the FCA. *See* 31 U.S.C. § 3729(a)(3) (2008) (imposing liability on any person who "conspires to defraud the Government"); *id.* § 3729(a)(1)(C) (West 2010) (imposing liability on any person who "conspires to commit a violation of" other paragraphs of § 3729(a)(1)); *see also Davis*, 591 F. Supp. 2d at 40. However, as defendants note, relator alleges only that defendants defrauded the United States (Am. Compl. ¶ 78), and nowhere in the complaint does he allege that defendants *conspired* to do so. (*See* Defs.' Mem. at 20.) Nor did relator respond to this argument in his opposition brief. "It is therefore proper to treat defendant's argument as conceded." *Franklin v. Potter*, 600 F. Supp. 2d 38, 60 (D.D.C. 2009) (citing cases). Count Two shall therefore be dismissed for failure to state a claim under Rule 12(b)(6).

### CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted in part and denied in part. Count One is dismissed to the extent that the causes of action asserted are based upon defendants' alleged mislistings of product information on the GSA Advantage website; however,

Count I survives to the extent that its causes of action are based upon defendants' alleged mislistings of product information on the SEWP website.  Count II is dismissed in its entirety.

A separate order accompanies this Memorandum Opinion.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

DATE:  April 19, 2010