UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*ex rel.*<br><br>BRADY FOLLIARD,<br><br>   Plaintiff-Relator,<br><br>v.<br><br>CDW TECHNOLOGY SERVICES, INC., and<br>CDW GOVERNMENT, INC.,<br><br>   Defendants. | Civil Action No. 07-2009 (ESH) |

## MEMORANDUM OPINION

Plaintiff-relator Brady Folliard ("relator") brings this *qui tam* action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*, on behalf of the United States against defendants CDW Technology Services, Inc. ("CDWTS") and CDW Government, Inc. ("CDWG") (collectively "CDW"). Defendants now move to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), arguing that another *qui tam* complaint, filed two years before the instant complaint, deprives the Court of subject matter jurisdiction under the "first-to-file" bar of 31 U.S.C. § 3730(b)(5). For the reasons discussed herein, defendant's motion will be granted.

## BACKROUND

The Court need not repeat the facts and procedural history previously set forth in a prior Memorandum Opinion, *see United States ex rel. Folliard v. CDW Tech. Servs., Inc.*, No. 07-CV-

1

2009, 2010 WL 1541224, at *1-*3 (D.D.C. Apr. 21, 2010), but will limit its discussion to those facts that relate only to this motion.

I.   **THE LIOTINE ACTION**

In 2005, Joseph Liotine filed a *qui tam* suit under the FCA against CDWG in the U.S. District Court for the Southern District of Illinois. *See* Compl., *United States ex rel. Liotine v. CDW-Government, Inc.*, No. 05-CV-033 (S.D. Ill. filed Jan. 19, 2005) ("Liotine Compl."). Paragraph 70(F) of the Liotine complaint alleges that CDW violated the FCA in part by

> [s]elling non trade compliant items such as certain Tektronix printers (from 1999 to 2001) and accessories which originated from non trade compliant countries. While the government could purchase such items through an open market card, the items could not be listed in the GSA schedule. Despite this, Defendant knowingly listed approximately 20-25 similar items (such as certain HP backup tapes) which were created or assembled in non-trade compliant countries. Because Defendant deliberately placed every item into one database, trade compliant and non trade compliant goods were commingled.

*Id.* ¶ 70(F).

II.  **THE INSTANT MOTION**

Relator Folliard filed the instant suit in 2007. The gravamen of Folliard's complaint is that from 2007 to the present, CDW submitted false claims to the government by selling Hewlett-Packard ("HP") computer products and supplies in contravention of the Trade Agreements Act ("TAA"), 19 U.S.C. §§ 2501 *et seq.*, through the GSA Advantage and Solutions for Enterprise-Wide Procurement ("SEWP") websites maintained by the General Services Administration ("GSA") and the National Aeronautics and Space Administration ("NASA"), respectively. As alleged in the complaint, when federal agencies make purchases for public use pursuant to acquisition contracts, they may only buy products from "designated" countries as specified in the TAA and its related regulations. *See Folliard*, 2010 WL 1541224, at *1. The

2

Court previously dismissed Folliard's claims relating to the GSA procurement portal under Federal Rule of Civil Procedure 12(b)(6). *See id.* at \*14.

Defendants now argue that Folliard's lawsuit is barred under 31 U.S.C. § 3730(b)(5), which provides that "no person other than the Government may . . . bring a related action based on the facts underlying" an earlier-filed *qui tam* action. In response, Folliard argues that his complaint is distinguishable from Liotine's because they allege different types of fraud involving different federal contracts and agencies. (*See* Pl.'s Opp'n to Defs.' Mot. to Dismiss ["Pl.'s Opp'n"] at 2, 5.) The United States, which has not intervened in this case, filed a statement of interest that largely echoes Folliard's position. Defendants respond that Folliard's argument elevates form over substance, and that in light of the analysis of § 3730(b)(5) in *United States ex rel. Hampton v. Columbia/HCA Healthcare Corp.*, 318 F.3d 214 (D.C. Cir. 2003), Folliard's claims are barred because they are based on the "same material elements of fraud" as Liotine's. *See id.* at 217.

## ANALYSIS

The parties agree that *Hampton*'s analysis of the first-to-file rule governs the instant motion, but defendants advocate for dismissal by arguing that *Hampton* is controlling, while relator retorts that *Hampton* is distinguishable. Applying the controlling law to the allegations by Folliard and by Liotine, the Court is persuaded that *Hampton* and the statutory text require dismissal of Folliard's claims.

In *Hampton*, the D.C. Circuit found that the plaintiff's FCA *qui tam* action, in which she alleged that the defendants had engaged in Medicare home health care billing fraud, was barred by an earlier-filed action that alleged a similar fraudulent scheme by one of the same defendants. *See* 318 F.3d at 218-19. The Court of Appeals concluded that § 3730(b)(5) served to bar

"'actions alleging *the same material elements of fraud*' as an earlier suit, even if the allegations [of the later-filed complaint] 'incorporate somewhat different details.'" *Id.* at 217 (quoting *United States ex rel. Lujan v. Hughes Aircraft Co.*, 243 F.3d 1181, 1189 (9th Cir. 2001)) (emphasis added). In so doing, the Court rejected "another possible test, one barring claims based on 'identical facts.'" *Id.* at 218. Acknowledging that there is no bright line rule for determining whether differences between complaints are "material," the Court held that § 3730(b)(5) bars a subsequent action if it contains "merely variations" of the fraudulent scheme described in the first action. *Id.*

Here, Folliard's complaint alleges procurement fraud related to both the GSA and NASA contracts.[1] He claims that CDW submitted false claims and made false statements with respect to HP products listed for sale on the GSA Advantage and SEWP websites, in that CDW falsely listed those products as originating in the United States or as TAA-compliant when, in fact, the products did not originate here or in any other designated country. (*See* Am. Compl. ¶¶ 19-70, 73-75, Exs. 1A-1B; *see also* Pl.'s Opp'n at 7-8.) As Folliard alleges, these mislistings would be material because, by the express terms of its GSA contract and related federal acquisition regulations, CDWG "certified that it would only sell end products under these contracts to the United States Government that originate in designated countries," and that it would not sell end products that originate in non-designated countries such as China, India, and Malaysia. (Am. Compl. ¶ 17.) Similarly, SEWP allegedly requires vendors to correctly indicate a product's country of origin so that NASA contracting officers can determine the TAA's applicability to that product on a case-by-case basis. (*See id.* ¶ 23.) Liotine's complaint also alleges that CDWG

---

[1] Although the Court has dismissed Folliard's GSA-related claims under Rule 12(b)(6), this is not relevant under § 3730(b)(5), which looks only to whether a later-filing relator has "br[ought] a related action." These GSA claims clearly would have been barred by the first-to-file rule had the instant jurisdictional motion been filed before the Rule 12(b)(6) motion.

listed and sold HP products on the GSA website that were not TAA-compliant,[2] but unlike Folliard, Liotine does not allege that CDWG misrepresented those products as TAA-compliant. Rather, CDWG's claims were false because it had certified to GSA that it would not sell non-compliant products through the GSA portal. Therefore, according to Folliard, the fact that the fraudulent scheme alleged by Liotine did not involve misrepresentations about products' countries of origin means that Liotine alleged a materially different type of fraud than Folliard does. (*See* Pl.'s Opp'n at 4-5.) In light of *Hampton*, the Court disagrees.

As the D.C. Circuit noted in *Hampton*, the "material elements" of a typical FCA claim – such as Folliard's – are that (1) the defendant presented a claim to the government, (2) the claim was false, and (3) the defendant knew that the claim was false. *See* 318 F. 3d at 218 (citing 31 U.S.C. § 3729(a)(1)-(3) (2002)). The Court of Appeals then compared the text of the plaintiff's complaint and the earlier-filed complaint to determine if their differences were material. The plaintiff's complaint alleged, *inter alia*, that the defendants "submitted improper bills for services for her mother and other patients" by "bill[ing] for services that were miscoded; already paid for; performed by others; [or] never administered," and by billing for "supplies and medications that were unnecessary or never received . . . ." *Id* at 219. The earlier-filed complaint contended that one of the defendant's "home health subsidiaries billed the government for services that did not meet the Medicare eligibility criteria, for undocumented services, and for services not medically necessary." *Id.* Although the two complaints differed slightly in some of the types of billing fraud alleged (*e.g.*, "miscoded" bills versus "undocumented" services), the Court of Appeals

---

[2] Although the Liotine complaint does not explicitly reference the TAA, the Court agrees with defendant that by including phrases such as "non-trade compliant countries," Liotine put the government on notice that CDW was allegedly violating the requirements of the TAA with respect to the sale of HP products. (*See* Reply in Supp. of Defs.' Mot. to Dismiss ["Defs.' Reply"] at 4 n.4.)

5

found that both sets of allegations established the same material elements of fraud, and that the plaintiff's claims merely listed additional examples of how the common defendant defrauded the government within the context of home health services. *See id.* at 218-19.

*Hampton* thus counsels that this Court must compare the Liotine and Folliard complaints at a sufficiently high level of generality, because Folliard's later-filed complaint will not pass muster by merely providing additional details about "the nature and extent of [the] fraud in the provision of" a given set of services (*i.e.*, government procurement services), even if the manner of the later-alleged fraud "varie[s] greatly . . . ." *Id*. at 219. Here, both Liotine and Folliard allege that (1) CDWG presented a claim to the government related to HP products listed through a procurement portal; (2) the claim was false by virtue of CDWG's failure to adhere to the requirements imposed upon government contractors in accordance with the TAA and related regulations; and (3) CDWG knew the claims were false. The difference between Liotine's allegations of non-compliant listings and Folliard's allegations of non-compliant listings *that were misrepresented as compliant* is therefore immaterial. Folliard's complaint merely alleges a variation on how CDW defrauded the government under the TAA in the course of fulfilling HP procurement orders, much as the *Hampton* plaintiff merely alleged additional examples of how the defendant there had defrauded the government under Medicare vis-à-vis home health services. Indeed, to credit Folliard's argument under the "material elements" test would come dangerously close to adopting the "identical facts" test that was explicitly rejected by *Hampton*.

The United States and Folliard also argue that the latter's allegations are distinguishable from Liotine's because they involve "completely different contracts and completely different agencies," unlike the two complaints at issue in *Hampton*, which both asserted the same material elements fraud in the context of home health services. (U.S. Second Statement of Interest at 4

("U.S. Stmt."); *see also* Pl.'s Opp'n at 11-12.) No court appears to have squarely addressed this question,[3] but the United States suggests that the different procurement contracts and contracting agencies are relevant because the critical question is not whether the government as a whole was on notice of fraud related to the defendant, but rather whether "the *administrating agencies themselves* were on notice of the potential fraud in connection with their respective contracts." (U.S. Stmt. at 4 n.3 (emphasis added).) However, the text of § 3730 and the statute's underlying policies do not support the creation of a distinction between the two complaints on this basis.[4]

Section 3730(a), entitled "Responsibilities of the Attorney General," provides that "[t]he *Attorney General* diligently shall investigate a violation under section 3729," and that "[i]f the *Attorney General* finds that a person has violated or is violating section 3729, the *Attorney General* may bring a civil action under this section against the person." 31 U.S.C. § 3730(a) (emphases added). This language strongly suggests that once a relator has alleged, in the

---

[3] *Compare United States ex rel. Pratt v. Alliant Techsystems, Inc.*, 50 F. Supp. 2d 942, 950 (C.D. Cal. 1998) (stating in *dicta* that "a new defendant and different contracts" would "preserve the Court's jurisdiction" under the first-to-file bar), *with Hyatt v. Northrop Corp.*, No. 87-CV-6892, 1989 U.S. Dist. LEXIS 18941, at *4 (C.D. Cal. Dec. 27, 1989) (dismissing, without analysis, allegations under first-to-file bar despite different government contract underlying some of the later-filed claims).

[4] In addition, the Court's prior opinion suggests that each procurement contract is only material to the elements of Folliard's claims because it is associated with a specific website where defendants allegedly mislisted the HP products at issue. The Court previously determined that each agency's procurement website represents the "place" (if only in cyberspace) where part of the alleged fraud took place. *See Folliard*, 2010 WL 1541224, at *8. Thus, where Liotine alleged that defendants listed non-compliant items "on the GSA schedule" by placing them "into one database," *see* Liotine Compl. ¶ 70(f), Folliard alleged that defendants listed non-compliant items in that same GSA location as well as another, SEWP. However, *Hampton* clarifies that where a later-filed complaint adds different locations for the alleged fraud, these "are not differences in the material elements of the fraud." 318 F.3d at 218 (rejecting later-filing plaintiff's argument that her complaint was not barred because it alleged fraud by common defendant's subsidiary in Georgia, while first-filed complaint alleged fraud in other states but not Georgia); *see also, e.g.*, *United States ex rel. Branch Consultants v. Allstate Ins. Co.*, 560 F.3d 371 (5th Cir. 2009) (holding that later-filed case "could not avoid the preclusive effect of [the first-filed case] by focusing on additional instances of fraud occurring in other geographic locations").

government's name, that a defendant submitted false claims to *any* federal governmental entity, this filing serves first and foremost as notice to the Attorney General that he should investigate the allegations. Accordingly, the statutory language suggests that the primary function of a *qui tam* complaint is to notify the *investigating* agency, *i.e.*, the Department of Justice ("DOJ"). *Cf. United States ex rel. Batty v. Amerigroup Illinois, Inc.*, 528 F. Supp. 2d 861, 874 (N.D. Ill. 2007) ("The allegations in [the earlier-filed action] of which *the government had notice and an opportunity to investigate* should be considered in determining whether Plaintiff's case is duplicative [under § 3730(b)(5)]." (emphasis added)); *United States ex rel. Chovanec v. Apria Healthcare Group Inc.*, 606 F.3d 361, 2010 U.S. App. LEXIS 10200, at *8-*9 (7th Cir. 2010) (explaining that § 3730(b)(5) is intended to bar "secondary suits that do no more than *remind the United States* of what it has learned from the initial suit," because "[t]he author of the fraud won't escape when the first suit (*or the ensuing federal investigation*) tells the agency everything it needs to know" (emphases added)).[5]

Moreover, the policy underlying § 3730 militates against accepting relator's argument. In *Hampton*, the D.C. Circuit noted that the history of the False Claims Act bears heavily on interpreting the first-to-file bar because it "demonstrates repeated congressional efforts to walk a fine line between encouraging whistle-blowing and discouraging opportunistic behavior." 318 F. 3d at 218. The Court of Appeals therefore concluded that § 3730(b)(5) "must be analyzed in the context of these twin goals of rejecting suits which the government is capable of pursing itself, while promoting those which the government is not equipped to bring on its own.'" *Id.* (quoting *United States ex rel. Springfield Terminal Ry. v. Quinn*, 14 F.3d 645 (D.C. Cir. 1994)). For this

---

[5] *Apria*'s passing reference to "tell[ing] the agency everything it needs to know" might seem to support the United States' argument about the importance of notice to the administering agency, but *Apria* – like *Hampton* – considered multiple suits alleging Medicare billing fraud and had no occasion to consider the precise question presented here.

reason, courts must strive to minimize "duplicative claims" that "do not help reduce fraud or return funds to the federal fisc, since once the government knows the essential facts of a fraudulent scheme, it has enough information to discover related frauds." *United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs.*, Inc., 149 F.3d 227, 234 (3d Cir.1998). As this Court has recognized, "[p]ermitting infinitely fine distinctions among complaints has the practical effect of dividing the bounty among more and more relators" by constricting how broadly a court will construe the fraud alleged in – and thus the potential recovery on – the first-filed complaint, "thereby reducing the incentive to come forward with information of wrongdoing." *United States ex rel. Ortega v. Columbia Healthcare, Inc*., 240 F. Supp. 2d 8, 12 (D.D.C. 2003). Thus, the purpose of the first-to-file bar is not to enable the government to intervene at its discretion in materially similar fraud actions, but to protect the first-filed relator precisely in order to incentivize private citizens to bring informative claims under the FCA.

To permit Folliard's suit would contravene these statutory policies. Folliard never worked for the defendants, and his complaint contains no "insider" information that a DOJ attorney who was already investigating Liotine's complaint could not have learned. Rather, Folliard merely reiterated Liotine's core allegation that CDWG was making false claims related to federal procurement of HP products. It is irrelevant "whether the United States put[] those facts to their best use. The allegations of the [*Liotine*] suit[] are what they are . . . ." *Chovanec*, 2010 U.S. App. LEXIS 10200, at *12. Rather, the question is whether Folliard's lawsuit alleges a "materially similar situation[] that . . . investigations launched in direct consequence of [Liotine's] complaint[] *would have* revealed . . . ." *Id.* at *8 (emphasis added); *cf. id.* at *11 (finding later-filed action alleging billing fraud in Illinois between 2002 and 2004 was barred by earlier-filed allegations about same defendant's 1990s billing fraud in California and Kansas,

9

despite the fact "that the United States apparently did not conduct the sort of follow-up investigation and prosecution that would have prevented [the defendant's] office in Illinois from conducting an upcoding scam in the early 2000s").

It is reasonable to conclude that the government, armed with Liotine's allegations about government procurement of HP products from CDWG, was "equipped . . . on its own" to discover the extent to which defendants had other federal procurement contracts that were governed by the TAA and, in turn, whether any wrongdoing had occurred. *See Hampton*, 318 F.3d at 218. For example, a DOJ attorney looking into Liotine's claims could have easily reviewed publicly available information to determine whether CDWG was a party to other government procurement contracts that required TAA-compliance. *See, e.g.*, CDW-G, Federal Government Resources, Products and Solutions, *at* http://www.cdwg.com (permitting registered users to search public contract information by federal agency and specific contract) (last visited June 28, 2010); *see also* CDW-G Federal Government, *at* http://web.archive.org/web/20060829090124/http://www.cdwg.com/shop/profiles/federal.asp (same, as archived on Aug. 29, 2006) (last visited June 28, 2010). The investigating attorney could then have determined whether CDWG was listing any HP products for sale through the procurement portals associated with those contracts.

In sum, to permit Folliard's complaint to proceed under the above circumstances would deviate from "'the golden mean'" between offering "'adequate incentives for whistle-blowing insiders with genuinely valuable information'" and discouraging "'opportunistic plaintiffs who have no significant information to contribute of their own . . . .'" *Graham County Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 130 S. Ct. 1396, 1406 (2010) (quoting *United States ex rel. Springfield Terminal R.R. Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994)).

Accordingly, the Court concludes that Folliard's action is "based on the facts underlying" Liotine's previously filed *qui tam* action, and it is therefore barred under § 3730(b)(5).

## CONCLUSION

For the foregoing reasons, defendants' motion is granted, and the complaint is dismissed for lack of jurisdiction. A separate order accompanies this Memorandum Opinion.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

DATE: June 28, 2010